[Cite as *State v. Arnette*, 2026-Ohio-2757.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NOS. CA2025-05-037 |
| Appellee, | : | CA2025-05-038 |
| vs. | : | <u>OPINION AND</u> |
| | | <u>JUDGMENT ENTRY</u> |
| LUCAS ARNETTE, | : | 7/20/2026 |
| Appellant. | : | |
| | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2024-03-0425


Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Susannah M. Meyer, for appellant.


# **O P I N I O N**

**M. POWELL, J.**

{¶ 1} Lucas Arnette appeals his convictions, following a jury trial in the Butler County Court of Common Pleas, on two counts of rape, three counts of gross sexual imposition, three counts of unlawful sexual conduct with a minor, one count of public

indecency, and one count of sexual battery. Finding no error, we affirm.

## I. Factual and Procedural Background

## A. The Offenses

{¶ 2}  "Madison" (a pseudonym to protect the victim's privacy) was born on September 4, 1999. She grew up close to her older sister, Kayla, and to Mallory, an older cousin who married Arnette in 2014. Madison spent a great deal of time in Arnette's company, at her own parents' home, at the homes of relatives, and at the house Arnette and Mallory shared, where she often stayed overnight. She testified that Arnette sexually assaulted her between 20 and 25 times over roughly four years, beginning when she was 12.

{¶ 3}  Madison described several of the incidents. At Christmastime when she was 12, at her parents' home on Highgrove Court, she was lying on her stomach on a couch when Arnette, seated beside her, began rubbing her neck, moved his hand beneath her shirt, and pinched her nipple. Later that same year, while she was staying overnight at the Gray Road home of Connie Musselman, her aunt and Mallory's mother, Arnette sat down beside her on a couch late at night, guided her hand to his lap, pulled out his erect penis, and had her touch it. In the summer of 2014, while Madison was babysitting at Kayla's house on Highgrove Court, Arnette pulled her onto his lap, pushed her forward onto her hands and knees, moved her clothing aside, and touched her vagina with his fingers.

{¶ 4}  The remaining counts arose at the Pleasant Avenue house in the City of Hamilton, where Arnette and Mallory lived and where Madison frequently slept over. When she was 15, she awoke on the couch in the early morning to find Arnette pulling her upright, opening her mouth with his thumb and forefinger, and placing his penis in her

mouth. In August 2015, while staying at the house for a week during her parents' vacation, she awoke to Arnette pulling her legs apart and inserting his fingers into her vagina. On another occasion that summer she awoke to find Arnette beside her, and he draped her leg over his lap, penetrated her with his fingers, and masturbated to ejaculation. Madison testified that the assaults then stopped for several years.

{¶ 5}   The final offense was alleged to have occurred on July 4 or 5, 2020, when Madison, then 20, smoked marijuana with Arnette and Mallory and fell asleep at their home. She testified that Arnette performed oral sex on her while she lay impaired and asleep, and that she afterward received a message directing her to "hush money" in her purse, where she found pre-rolled marijuana.

{¶ 6}   Madison acknowledged that she told no one for years. She explained that she had convinced herself the abuse was not "that big of a deal," that she feared her family would not believe a child over an adult, and that a disclosure would be catastrophic for Mallory, on whom she believed the news would fall hardest. She also acknowledged that she continued to socialize with Arnette, to appear with him in photographs, and to exchange friendly messages with him well after the abuse she described.

### B. Disclosure and Investigation

{¶ 7}   Madison first disclosed the abuse to her boyfriend in the summer of 2020, and later that year to a longtime friend, Crystal Stacey, who described a marked change in Madison's demeanor beginning in July 2020. She also disclosed the abuse to a subsequent boyfriend, Greg Beach, in September 2022. In mid 2023 she told Kayla, who pressed her to tell Mallory. The disclosure moved quickly through the family, and Madison testified that once Mallory told the family, "I had no choice. I had to come forward to the police, or else my family would not have been okay."

{¶ 8} Madison made a report to the Fairfield Police Department on November 11, 2023, and Detective Brian Wells was assigned to the case two days later. Wells, a certified digital forensic operator and physical analyst, extracted the data from Madison's phone on November 14, notified Arnette that he was under investigation on December 5, and, on January 12, 2024, executed a search warrant for Arnette's phone. Wells also testified, address by address, to the county in which each charged offense occurred, placing the Gray Road, Hardell Drive, and Pleasant Avenue addresses in Butler County and the Highgrove Court addresses in Hamilton County.

{¶ 9} Text messages exchanged between Arnette and Madison in November 2023 were admitted without objection as State's Exhibit 21. In them, Arnette at first denied the accusation categorically, writing, "Why did you tell everyone I tried raping you? . . . I never did that, especially when you were freaking 12 years old." But then he sent a lengthy apology, which included an expression of suicidal thoughts and an acknowledgment that his own trauma had turned him into a monster.

## C. The Indictments and the First Trial

{¶ 10} Arnette was indicted in Butler County on April 3, 2024, in case No. CR2024-03-0425, on two counts of gross sexual imposition under R.C. 2907.05(A)(4), one count of gross sexual imposition under R.C. 2907.05(A)(1), two counts of rape under R.C. 2907.02(A)(2), three counts of unlawful sexual conduct with a minor under R.C. 2907.04(A), and one count of public indecency under R.C. 2907.09(B)(1). The case was tried to a jury in October 2024. Mallory testified for the defense. She said that she had disbelieved the allegations, that she suffered from what she described as a "fawning" trauma response, and that she had told Arnette to compose an apology that "felt real" so that Madison would "feel like the victim," in order to keep the peace within the family.

Asked who wrote the apology, she said variously that she had helped compose it, that she had only corrected Arnette's grammar, and finally that Arnette had written it. The jury could not reach a verdict, and the court declared a mistrial.

{¶ 11} On December 23, 2024, Arnette was separately indicted in case No. CR2024-12-1905 on one count of sexual battery under R.C. 2907.03(A)(2), charging the July 2020 conduct.

### D. The Second Trial

{¶ 12} The two cases were tried together to a jury over four days in March 2025.[1] Madison again testified, as did Kayla, Crystal Stacey, Greg Beach, and Detective Wells. The defense called Connie Musselman, her husband Edward Scott Musselman, and Arnette's brother Timothy, each of whom described Madison as attention-seeking and affectionate toward Arnette and reported observing nothing untoward. Natalie Brune, a friend of Mallory, Kayla, and Madison, likewise testified that she had never seen inappropriate behavior between Arnette and Madison and had no concerns about letting her own children be around Arnette.

{¶ 13} The State also called Heidi Malott, a licensed independent social worker and forensic interviewer at the Mayerson Center for Safe and Healthy Children, who was qualified without objection as an expert in child sexual abuse and its dynamics. Malott testified generally that disclosure is a process rather than an event, that most child victims delay reporting, and that fear, shame, and attachment to the abuser are common barriers to disclosure. She had not met Madison, had not interviewed her, and had been told nothing of the allegations.

---

1. The transcript of the first trial was filed as part of our appellate record herein. The first trial transcript was not presented as evidence in the second trial or otherwise made available to the jury.

{¶ 14} During the cross-examination of Madison, the State objected on relevance and hearsay grounds to defense exhibits consisting of text messages, photographs, and social-media posts reflecting Madison's continued contact with Arnette. The trial court ruled that counsel was free to ask Madison whether she had continued to communicate with Arnette, to socialize with him, and to appear in photographs with him, and that the exhibits would become admissible if she denied the contact. Counsel then examined Madison on those subjects, and she acknowledged the continued contact.

{¶ 15} Mallory did not testify at the second trial. In her place the parties stipulated that during a December 7, 2023 conversation between Mallory and Madison, "the validity or authorship of the defendant's text message apologies sent to [Madison] on 11/6, and 11/7 were never questioned by Mallory."

{¶ 16} After the State rested, Arnette moved for acquittal under Crim.R. 29, arguing generally that the State had failed to meet its burden to present evidence for each element of the offenses. The court disagreed and overruled the motion.

{¶ 17} Mallory was in the courtroom during the State's closing argument. The prosecutor, addressing the absence of any expression of doubt as to Madison's allegations in text messages that Mallory sent to Madison, suddenly said, "you can shake your head yes, but it never happened." The trial court called a sidebar, at which the prosecutor explained that "[t]he wife [Mallory] is emphatically making nonverbal communication to the jury, so [I] was kind of forced into it." The court admonished counsel that closing argument is addressed to the jury and not to members of the gallery. Arnette did not object or request an instruction.

{¶ 18} Over Arnette's objection, the trial court instructed the jury that testimony had been admitted indicating that Arnette "made apologies with suicidal comments to and/or

provided hush money or goods to [Madison]," and that such conduct "may tend to indicate the defendant's consciousness and[/]or awareness of guilt." The instruction cautioned that the conduct alone raised no presumption of guilt, that the jury must disregard the evidence if it found another motive or could not determine the motive, and that even upon finding a guilty motive the jury was not required to consider the evidence at all. The court further instructed that the parties had agreed to the stipulated fact and that the jury was to accept it as proven. During deliberations the jury sent a question to the court asking, "why is [sic] there two counts of rape in overlapping time frames?" The court answered that the State had alleged "that two separate instances may or may not have occurred, during a potentially overlapping time frame," and directed the jury to reread the multiple-counts instruction at pages eight and nine of the written charge. Arnette did not object.

{¶ 19} The jury found Arnette guilty on all counts. In April 2025, the trial court merged two counts of unlawful sexual conduct with a minor into the corresponding rape counts and sentenced him to an aggregate term of 17.5 years for the offenses in case No. CR2024-03-0425, and to a consecutive 36-month term for the sexual-battery offense in case No. CR2024-12-1905, for a total of 20.5 years in prison.

{¶ 20} Arnette appealed.

## II. Analysis

{¶ 21} Arnette raises six assignments of error. He first claims that his trial counsel was constitutionally ineffective for failing to move for acquittal on the ground that the State failed to prove venue. The second argues that the convictions are against the manifest weight of the evidence. Arnette's third assignment challenges the admission of Malott's expert testimony on delayed disclosure. The fourth alleges prosecutorial misconduct in the State's closing argument and in its use of the apology. The fifth attacks the jury

instructions as misleading and confusing. And the sixth is another claim that counsel was ineffective, this time for proceeding by stipulation rather than calling Mallory to testify.

## A. Ineffective Assistance of Counsel— Failure to Move for Acquittal on Venue

{¶ 22} The first assignment of error alleges:

> LUCAS ARNETTE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN THAT COUNSEL'S REPRESENTATION WAS PROFESSIONALLY UNREASONABLE, IS PREJUDICIAL TO DEFENDANT, AND FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS.

{¶ 23} In his first assignment of error, Arnette argues that his trial counsel was constitutionally ineffective for failing to move for acquittal under Crim.R. 29 on the ground that the State failed to prove venue.

### 1. Standard of Review and Governing Law

{¶ 24} An ineffective-assistance claim is reviewed de novo under the familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). Arnette must show both that counsel's performance "fell below an objective standard of reasonableness," *Strickland* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. Failure on either prong is fatal to the claim. *Id*. at 697; *State v. Brown*, 2025-Ohio-500, ¶ 43 (12th Dist.).

{¶ 25} The legal rules governing venue are equally settled. Section 10, Article I of the Ohio Constitution guarantees an accused a trial "by an impartial jury of the county in which the offense is alleged to have been committed," a guarantee codified in R.C. 2901.12(A). Venue is not a material element of any offense, but it is a fact the state must prove beyond a reasonable doubt unless waived. *State v. Headley*, 6 Ohio St.3d 475, 477 (1983); *State v. Jackson*, 2014-Ohio-3707, ¶ 143. Venue "need not be proven in express

terms; it may be established either directly or indirectly by all the facts and circumstances of the case," and trial courts enjoy "broad discretion to determine the facts that would establish venue." *Jackson* at ¶ 144, citing *Headley* at 477.

## 2. The State Proved Venue

{¶ 26} Arnette's argument rests on our decision in *State v. Lahmann*, 2007-Ohio-1795 (12th Dist.). There, we concluded that "testimony showing that an offense occurred at a particular street address, standing alone, is generally insufficient to prove venue, since such addresses often are not 'sufficiently unique' to permit the conclusion that the address is located in a particular city or county." *Lahmann* at ¶ 34. Because the prosecution in *Lahmann* offered nothing beyond a bare street address, and because trial counsel never moved for acquittal, we found counsel ineffective and ordered the defendant discharged. *Id*. at ¶ 45.

{¶ 27} *Lahmann*'s rule does not carry Arnette's argument, because its factual premise is missing here. In *Lahmann*, a street address stood alone. In this case, it did not. Madison testified that Arnette sexually assaulted her at five specific addresses, and Detective Wells then testified, address by address, to the county in which each is located. He placed Gray Road in Fairfield, Butler County; Pleasant Avenue in Hamilton, Butler County; Hardell Drive in Fairfield, Butler County; and Highgrove and Highgrove Court in Hamilton County. The evidentiary problem that decided *Lahmann*, the absence of any testimony connecting an address to a county, was filled in this trial by direct testimony.

{¶ 28} Arnette responds that Detective Wells's testimony should not count because he was never dispatched to the scenes, which were reported roughly a decade after most of the offenses, and thus lacked personal knowledge of where the crimes occurred. The argument misunderstands both the venue cases and Evid.R. 602. The

cases Arnette cites, in which venue was inferred from a responding officer's testimony about his jurisdiction, illustrate one way circumstantial evidence may establish venue. *See State v. Holloway*, 2025-Ohio-1637, ¶ 16-17 (1st Dist.). They do not hold that a responding officer is the only witness competent to identify a county. Detective Wells investigated this case and testified to the "multi-jurisdictional aspects" of his investigation. The location of the streets and addresses he investigated is a matter within the firsthand knowledge an investigating detective acquires; any claimed weakness in the basis of that knowledge went to the weight of his testimony, not its admissibility, and certainly did not render the venue evidence insufficient when viewed, as Crim.R. 29 requires, in the light most favorable to the state.

{¶ 29} Arnette also emphasizes that the offenses spanned two counties, Hamilton and Butler. That fact does not defeat venue in Butler County. It invokes R.C. 2901.12(H), which provides that "[w]hen an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." Offenses involving "the same victim" are prima facie evidence of a course of criminal conduct. R.C. 2901.12(H)(1); *see Jackson*, 2014-Ohio-3707, at ¶ 145-146. Every count in both indictments involved the same victim and reflected a continuing pattern of sexual abuse by the same offender exploiting the same family relationship. Several of those offenses, including the rapes at Pleasant Avenue and the sexual battery at Hardell Drive, occurred in Butler County. Venue for all counts, including the two gross-sexual-imposition counts arising at the Highgrove addresses in Hamilton County, was therefore proper in Butler County.

### 3. No Deficient Performance and No Prejudice

{¶ 30} Because the State's evidence established venue, a Crim.R. 29 motion premised on venue would have failed. Counsel does not perform deficiently by declining to make a futile motion, and no prejudice can flow from the absence of a motion that would have been denied.

{¶ 31} The first assignment of error is overruled.

### B. Manifest Weight of the Evidence

{¶ 32} The second assignment of error alleges:

THE TRIAL COURT ERRED WHERE LUCAS ARNETTE'S CONVICTION IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} In his second assignment of error, Arnette argues that his convictions are against the manifest weight of the evidence. He rests principally on inconsistencies between Madison's testimony at the first trial, which ended in a hung jury, and her testimony at the second trial, which ended in conviction. He adds that the second jury heard only a stipulation about Mallory Arnette rather than her live testimony, that defense witnesses contradicted the State's theory, and that the trial court improperly limited cross-examination of Madison.

### 1. Standard of Review

{¶ 34} A manifest-weight challenge examines "'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting *Black's Law Dictionary* (6th Ed. 1990). We review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and

created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *State v. Woodard*, 2017-Ohio-6941, ¶ 16 (12th Dist.). Although we sit as a "thirteenth juror," *Thompkins* at 387, the original trier of fact remains in the best position to judge the credibility of witnesses and the weight to be given the evidence, and we will reverse on manifest-weight grounds only in the exceptional case in which the evidence weighs heavily against conviction, *Woodard* at ¶ 16, 24.

### 2. Inconsistencies Between the Two Trials

{¶ 35} Central to Arnette's argument is a catalogue of discrepancies between Madison's first-trial and second-trial testimony. She testified in the first trial that Arnette "touched" her nipple during the first incident and in the second that he "pinched" it; she described lying on her side in one trial and on her stomach in the other; she estimated "closer to ten" incidents in the first trial and 20 to 25 in the second; she was uncertain in the first trial whether the abuse extended into 2016; and her account of July 4, 2020 shifted from a date on which Snapchat images triggered her memories to the date of the sexual battery itself.

{¶ 36} We begin with an observation about what this argument asks of us. The jury that found Arnette guilty heard none of Madison's first-trial testimony except to the extent defense counsel used it in cross-examination. Arnette in effect asks us to weigh the second verdict against a body of impeachment material and to conclude that no jury crediting Madison could rationally have done so. But that is a credibility determination of exactly the kind committed primarily to the trier of fact. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Cephas*, 2021-Ohio-4356, ¶ 16 (12th Dist.); *accord State v. Jackson*, 2002-Ohio-4705, ¶ 48 (12th Dist.). The

jury was free to believe all, part, or none of Madison's testimony, *Woodard* at ¶ 24, and defense counsel placed the inconsistencies squarely before it.

{¶ 37} Nor are the inconsistencies of a kind that compels disbelief. Madison described events that began when she was 12 years old and that she reported roughly a decade later. Whether an offender touched or pinched, whether a child lay on her side or her stomach, and whether repeated assaults over four years numbered ten or 20 are the sorts of details on which honest memory, particularly the memory of childhood trauma, commonly wavers. The core of Madison's account never wavered. At the second trial she described each charged incident with specificity, identifying where it occurred, what Arnette did, and how old she was. Her testimony was corroborated in significant respects by evidence the jury could credit independently of her memory, most notably Arnette's own text messages in State's Exhibit 21, admitted without objection, in which he wrote to Madison, "I'm terribly so sorry for what I've done to you," described "passing my demons on to you," and stated that "I know what I did is not okay." Her friend Crystal Stacey described Madison's marked behavioral change immediately after July 5, 2020, and Madison's disclosures to her boyfriend and friends in 2020, long before any family confrontation preceded the motive to fabricate that the defense suggested.

{¶ 38} The one inconsistency with genuine significance is the timeline argument directed at the age-dependent counts. Counts 4 through 8 charged conduct occurring before September 4, 2015, the date Madison turned 16, and Arnette notes that in the first trial Madison suggested the abuse may have continued into 2016. But at the second trial Madison placed the charged Pleasant Avenue offenses at age 15, within the indicted windows. Testimony that abuse may also have continued later would expand, not contradict, the proof that offenses occurred while she was 15. The jury heard her

birthdate, the charged date ranges, and the cross-examination, and nothing in its resolution suggests it lost its way.

### 3. The Absence of Mallory Arnette's Testimony

{¶ 39} Arnette next argues that the verdicts are against the weight of the evidence because the second jury heard only a stipulation concerning Mallory Arnette rather than the testimony she gave at the first trial. A manifest-weight challenge tests the evidence the jury heard. The decision not to call Mallory was the defense's own, and we address its consequences under the sixth assignment of error. For present purposes it suffices to say that a verdict cannot be against the manifest weight of the evidence because a witness the defense declined to call did not testify. And the premise that Mallory's testimony would have tipped the scales is doubtful anyway. As detailed below, her first-trial testimony about the apology was internally inconsistent and, on cross-examination, largely confirmed that Arnette himself drafted it.

### 4. The Limitation on Cross-Examination

{¶ 40} Arnette folds into this assignment of error a complaint that the trial court restricted his cross-examination of Madison by declining to admit certain exhibits, text messages, photographs, and social-media posts, offered to show her continued friendly contact with him. We review evidentiary rulings for an abuse of discretion. *State v. Powers*, 2024-Ohio-1521, ¶ 8 (12th Dist.).

{¶ 41} The record refutes Arnette's characterization. The trial court expressly permitted counsel to ask Madison whether she continued to text, socialize, and be photographed with Arnette through 2020, calling the inquiry "absolutely fair," and ruled only that the underlying exhibits would come in if she denied the contact, given the hearsay concerns they presented. Counsel then cross-examined Madison extensively on

precisely these subjects, and she admitted the continued contact, the friendly messages, and the photographs. The jury also heard that Madison, Kayla, and Mallory got tattoos together while Arnette watched the children, and it heard the defense theory that this conduct was inconsistent with abuse. Where the witness concedes the contact, the value of the documents themselves is limited, and excluding them on hearsay grounds while permitting full inquiry was well within the trial court's discretion. The limitation neither prevented Arnette from presenting his defense nor rendered the verdicts against the weight of the evidence.

### 5. Conclusion

{¶ 42} The State's case rested on the testimony of a victim the jury observed over two days of direct and extensive cross-examination, corroborated by the defendant's own written apologies, and the disclosure testimony of multiple witnesses. This is not the exceptional case in which the evidence weighs heavily against conviction.

{¶ 43} The second assignment of error is overruled.

### C. Expert Testimony on Delayed Disclosure

{¶ 44} The third assignment of error alleges:

> THE TRIAL COURT ERRED BY ADMITTING EXPERT TESTIMONY ON DELAYED DISCLOSURE THAT WAS HIGHLY PREJUDICIAL AND VIOLATED EVIDENCE RULE 403.

{¶ 45} In his third assignment of error, Arnette challenges the testimony of Heidi Malott, a licensed independent social worker and forensic interviewer, who testified as an expert on the dynamics of child sexual abuse, including the reasons victims frequently delay disclosure. Arnette contends the testimony lacked case-specific foundation under Evid.R. 702, invaded the province of the jury, and carried unfair prejudice substantially outweighing its probative value under Evid.R. 403.

**1. Standard of Review**

{¶ 46} Arnette did not object to Malott's qualification as an expert or to any portion of her testimony. He has therefore forfeited all but plain error. *Powers*, 2024-Ohio-1521, at ¶ 8 (12th Dist.). Plain error requires an obvious deviation from a legal rule that affected the outcome of the trial, and notice of plain error is taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus; *State v. Fuell*, 2021-Ohio-1627, ¶ 70 (12th Dist.).

**2. The Testimony Was Admissible**

{¶ 47} The governing rule comes from the Ohio Supreme Court's decision in *State v. Stowers*, 81 Ohio St.3d 260, 1998-Ohio-632. There is an important distinction between "expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused." (Emphasis sic.) *Stowers* at 262. Expert testimony explaining behaviors such as delayed disclosure "is permitted to counterbalance the trier of fact's natural tendency to assess recantation and delayed disclosure as weighing against the believability and truthfulness of the witness," and "'does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination.'" *Id*. at 263, quoting *State v. Gersin*, 76 Ohio St.3d 491, 494, 1996-Ohio-114. Applying *Stowers*, we have concluded that "only statements that directly support the veracity of the witness are prohibited." *State v. Fannin*, 2021-Ohio-2462, ¶ 62 (12th Dist.). In short, "[b]olstering is permitted, vouching is not." *State v. Svoboda*, 2021-Ohio-4197, ¶ 93 (1st Dist.).

{¶ 48} Malott's testimony fell comfortably on the permissible side of that line. She never met Madison, never interviewed her, and was given no details of the case. She

testified generally, and on the basis of professional literature and a quarter century of experience, about the prevalence of child sexual abuse, the barriers to disclosure, the reasons victims delay, and phenomena such as tonic immobility. She expressed no opinion that Madison was abused, no opinion that Madison was truthful, and no opinion about this case at all. Her testimony related directly to the evidence, because Madison had testified at length about why she delayed disclosure for nearly a decade, and it addressed a subject on which "'the common experience of a juror may represent a less-than-adequate foundation.'" *Stowers* at 262, quoting *State v. Boston*, 46 Ohio St.3d 108, 128 (1989).

{¶ 49} Arnette turns the generality of the testimony into his principal objection, arguing that because Malott knew nothing of the case, her testimony was speculative and untethered under Evid.R. 702. The argument has matters backwards. It is case-specific credibility opinion that risks invading the jury's province; an expert who educates the jury about general behavioral dynamics without opining on the particular child presents the least intrusive form of such evidence. Any claimed weakness in the factual basis of expert testimony goes to its weight, not its admissibility. *Miller v. Mission Essential Group, LLC*, 2023-Ohio-3077, ¶ 67 (10th Dist.). And under Evid.R. 403(A), evidence is excluded only when its probative value is "substantially outweighed" by the danger of unfair prejudice. All the State's evidence is prejudicial to a defendant; only unfairly prejudicial evidence is prohibited. *State v. Naugler*, 2005-Ohio-6274, ¶ 29 (12th Dist.). Testimony that dispels common misconceptions about disclosure is probative for the very reason *Stowers* identified, and nothing about Malott's general presentation was unfair.

### 3. *Snider* Does Not Help Arnette

{¶ 50} Arnette leans heavily on *State v. Snider*, 2022-Ohio-4566 (11th Dist.), which

reversed a conviction where an expert testified about recantation. But *Snider* did not hold that delayed-disclosure testimony is inadmissible or unduly prejudicial. It held that the expert's testimony exceeded the scope of his Crim.R. 16(K) report, which requires exclusion, and that counsel was ineffective for failing to object to that discovery violation. *Snider* at ¶ 22, 28, 32. The passages Arnette quotes, describing how such testimony "significantly buttressed" the victim's credibility, appear in *Snider*'s prejudice analysis; they explain why an undisclosed expert opinion mattered, not why a properly disclosed one should have been excluded. Arnette invokes Crim.R. 16(K) in passing, but he identifies nothing in this record suggesting that Malott's report was untimely, undisclosed, or narrower than her testimony. An appellate argument built on a discovery violation must point to a discovery violation. Absent one, *Snider* is simply a different case, and the controlling authority remains *Stowers* and our decision in *Fannin*, both of which admit the testimony given here.

{¶ 51} Because Malott's testimony was admissible, its admission was not error, plain or otherwise, and counsel's failure to object to admissible testimony was neither deficient nor prejudicial.

{¶ 52} The third assignment of error is overruled.

### D. Prosecutorial Misconduct

{¶ 53} The fourth assignment of error alleges:

> THE PROSECUTOR'S MISCONDUCT AND BAD FAITH
> DENIED LUCAS ARNETTE A FAIR TRIAL.

{¶ 54} Arnette's fourth assignment of error presents two claims of prosecutorial misconduct arising from the State's closing argument. First, the prosecutor directly addressed Mallory Arnette in the gallery. Second, the prosecutor repeatedly characterized Arnette's apology texts as evidence of consciousness of guilt.

## 1. Standard of Review

{¶ 55} To prevail on a claim of prosecutorial misconduct, "a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights." *State v. Warnock*, 2024-Ohio-382, ¶ 30 (12th Dist.), citing *State v. Elmore*, 2006-Ohio-6207, ¶ 62. The touchstone is "'the fairness of the trial, not . . . [the] culpability of the prosecutor.'" *Id*. at ¶ 31, quoting *State v. Gray*, 2012-Ohio-4769, ¶ 57 (12th Dist.). And misconduct "'is not grounds for error unless the defendant has been denied a fair trial.'" *Id*., quoting *State v. Olvera-Guillen*, 2008-Ohio-5416, ¶ 27 (12th Dist.). We review the closing argument in its entirety rather than parsing isolated remarks. *State v. Frazier*, 73 Ohio St.3d 323, 342, 1995-Ohio-235. Because Arnette did not object to either instance of alleged misconduct, our review is for plain error only. *Warnock* at ¶ 32.

## 2. The Remark to the Gallery

{¶ 56} Mallory was present in the courtroom for the State's closing argument. While addressing the text messages Mallory exchanged with Madison in the month after disclosure, and arguing that not one expressed doubt about Madison's account, the prosecutor said, "you can shake your head yes, but it never happened." The trial court immediately called a sidebar, and the prosecutor explained that "[t]he wife [Mallory] is emphatically making nonverbal communication to the jury, so [I] was kind of forced into it." The court admonished that closing argument is addressed to the jury, and the prosecutor agreed not to repeat the conduct.

{¶ 57} The prosecutor's remark was improper. Closing argument is confined to the evidence and the reasonable inferences it supports, *State v. Lott*, 51 Ohio St.3d 160, 165 (1990), and a courtroom spectator is neither. As the trial court indicated to the prosecutor, the correct response to disruptive nonverbal conduct in the gallery is a request that the

court address it, not a rhetorical exchange with the spectator.

{¶ 58} But impropriety is only half the inquiry, and on prejudice Arnette's claim fails. The comment was a single sentence in a lengthy closing. The prosecutor did not name Mallory, and nothing in the record establishes that the jury even understood the aside as directed at anyone in particular. The trial court intervened at once, and the conduct was not repeated. As for the absence of a limiting instruction, Arnette never requested one, and a curative instruction would have accomplished little beyond spotlighting an exchange the jury may scarcely have registered. On this record, we cannot say that but for the remark the outcome of the trial clearly would have been otherwise.

### 3. The Consciousness-of-Guilt Argument

{¶ 59} Arnette next contends the prosecutor acted improperly by urging the jury to treat his apology texts as consciousness of guilt when, Arnette says, Mallory testified at the first trial that she wrote the apology. The argument fails on both its law and its facts.

{¶ 60} On the law, prosecutors enjoy wide latitude to comment on the evidence and the reasonable inferences it supports. *Lott* at 165. State's Exhibit 21 contained Arnette's texts apologizing "for what I've done to you," describing the "courage" Madison showed in "bring[ing] this to life," attributing his conduct to his own childhood abuse, and recounting suicidal despair over "the guilt of passing my demons on to you." We and other Ohio courts have repeatedly recognized that a defendant's apology to the victim, and expressions of suicidal thoughts, may evidence consciousness of guilt. *See, e.g., State v. Simms*, 2009-Ohio-550, ¶ 24 (12th Dist.); *State v. Mills*, 2023-Ohio-1094, ¶ 32 (6th Dist.); *State v. Pryor*, 2013-Ohio-5693, ¶ 34 (5th Dist.). Arguing that inference from admitted exhibits is not misconduct.

{¶ 61} On the facts, Mallory's testimony at the first trial is not relevant, and she did

not testify at the second trial. There is only the parties' stipulation that "during a conversation between [Madison] and Mallory on 12/7/23, the validity or authorship of the defendant's text message apologies sent to [Madison] on 11/6, and 11/7 were never questioned by Mallory." This indicates that Arnette was the author of the apology's substance. The prosecutor did not mislead a jury. There was no impropriety, and necessarily no plain error.

{¶ 62} Finally, Arnette argues that these two claimed improprieties combined to produce prejudice. The cumulative-error doctrine applies only where multiple instances of harmless error have been found. *State v. Tucker*, 2012-Ohio-139, ¶ 47-48 (12th Dist.). We have found one improper but nonprejudicial remark and one instance of proper advocacy. There is nothing to accumulate.

{¶ 63} The fourth assignment of error is overruled.

### E. The Jury Instructions

{¶ 64} The fifth assignment of error alleges:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY PROVIDING JURY INSTRUCTIONS THAT WERE MISLEADING, CONFUSING, AND IMPROPERLY PREJUDICIAL.

{¶ 65} In his fifth assignment of error, Arnette challenges the jury instructions in three respects. He argues that the consciousness-of-guilt instruction was unduly prejudicial, that the structure of the multiple counts confused the jury, and that the instructions as a whole were misleading.

### 1. Standard of Review

{¶ 66} Jury instructions are matters left to the sound discretion of the trial court, and we may not reverse a conviction on the basis of faulty instructions "unless it is clear that the jury instructions constituted prejudicial error." *State v. Grimm*, 2019-Ohio-2961,

¶ 26 (12th Dist.). We review the instructions as a whole and will affirm if, taken in their entirety, they fairly and correctly state the law applicable to the evidence. *Id*.; *State v. Mott*, 2023-Ohio-2268, ¶ 18 (12th Dist.). Arnette objected to the consciousness-of-guilt instruction, which we accordingly review for abuse of discretion. He did not object to the jury instructions as a whole or to the trial court's response to the jury's question about the rape counts, forfeiting all but plain error as to those matters. *State v. Rhodus*, 2023-Ohio-3678, ¶ 13 (12th Dist.).

### 2. The Consciousness-of-Guilt Instruction

{¶ 67} The trial court instructed the jury that testimony had been admitted indicating that Arnette made apologies with suicidal comments to Madison and provided "hush money" or goods to her and that such conduct may tend to indicate consciousness of guilt. But the court cautioned the jury that it was free to assign the evidence such weight as it deserved.

{¶ 68} The instruction tracked the evidence. State's Exhibit 21 contained the apologies and the suicidal statements. Madison testified that after the July 4, 2020 assault she received a message from Arnette referencing "hush money" in her purse and found five marijuana joints there. As discussed under the fourth assignment of error, Ohio courts recognize that such conduct may evidence consciousness of guilt, and a trial court does not abuse its discretion by instructing on an inference the admitted evidence supports. *State v. Grimm*, 2019-Ohio-2961, ¶ 33 (12th Dist.). Arnette's real complaint is that the instruction "highlighted" damaging evidence. But every consciousness-of-guilt instruction does so; that is the nature of instructing on a permissible inference. The instruction did not direct the jury to draw the inference, did not vouch for the evidence, and preserved the jury's role.

{¶ 69} Arnette's related contention, that Mallory's first-trial testimony stripped the apology of probative value, fails for the reasons already given. Her testimony was not before the second jury, and it did not, in any event, establish that anyone other than Arnette authored the apology's substance.

### 3. The Jury's Question About the Rape Counts

{¶ 70} Arnette contends that the trial court's handling of multiple counts across two cases with overlapping time frames confused the jury, as shown by the jury's question during deliberations.

{¶ 71} During deliberations the jury asked, "why is [sic] there two counts of rape in overlapping time frames?" The court responded, "The State has alleged that two separate instances may or may not have occurred, during a potentially overlapping time frame," and directed the jury back to the multiple-counts instruction on pages eight and nine. Where a jury requests clarification, the trial court exercises its discretion in fashioning a response, and directing the jury to reread instructions that comprehensively answer the question is an appropriate exercise of that discretion. *State v. Mills*, 2001 WL 237096, *13 (12th Dist. Mar. 12, 2001).

{¶ 72} The court's answer was accurate and responsive. The State had in fact alleged two separate acts of sexual conduct, fellatio at age 15 and digital penetration in August 2015, whose charged windows overlapped. Far from inviting the jury to convict twice for the same conduct, the answer told the jury the counts rested on "two separate instances" and returned it to the multiple-counts instruction requiring separate consideration of each count on its own evidence. The jury's question demonstrates attentiveness, not confusion, and the court's answer resolved it. There was no error, much less an obvious one affecting the outcome.

**4. The Instructions as a Whole**

{¶ 73} Arnette's final contention, that the instructions taken in their entirety were misleading, is the sum of the two arguments just rejected. He identifies no other instructional language as erroneous. Because the components were sound, the whole was too.

{¶ 74} The fifth assignment of error is overruled.

**F. Ineffective Assistance of Counsel—Decision to Proceed by Stipulation**

{¶ 75} The sixth assignment of error alleges:

> LUCAS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶ 76} In his sixth assignment of error, Arnette argues that trial counsel was ineffective for declining to call Mallory Arnette at the second trial and instead entering a stipulation that, during her December 7, 2023 conversation with Madison, Mallory never questioned the validity or authorship of Arnette's text-message apology. Arnette reasons that Mallory's first-trial testimony would have neutralized the consciousness-of-guilt inference, and he points to the divergent outcomes of the two trials as proof of prejudice. The *Strickland* standard set out under the first assignment of error governs; it is strongly presumed that counsel's decisions fall within the wide range of reasonable professional judgment. *Brown*, 2025-Ohio-500, at ¶ 43 (12th Dist.).

**1. The Record Suggests the Decision Was Arnette's Own**

{¶ 77} The State first invokes the invited-error doctrine, under which a party may not take advantage of an error he induced. *State v. Baker*, 2022-Ohio-3271, ¶ 19 (12th Dist.). The argument has some merit. Counsel told the court he expected to call one more witness, asked for a recess to confer with Arnette, and returned to announce, "I have

been advised that we are going to close our case." The natural reading is that the client made the call. But the record does not conclusively identify who "advised" counsel, and we are reluctant to rest an ineffective-assistance ruling on an inference about a privileged conversation. We therefore proceed to the merits, where the claim independently fails on both *Strickland* prongs.

### 2. The Decision Not to Call Mallory Was Reasonable Trial Strategy

{¶ 78} "Counsel's decision to call a witness is a matter of trial strategy," and such decisions "will generally not be second-guessed by a reviewing court." *State v. Conway*, 2006-Ohio-2815, ¶ 113. Likewise, "decisions regarding what stipulations should be made . . . primarily involve trial strategy and tactics," and "[e]ven debatable trial strategies and tactics do not constitute ineffective assistance of counsel." *Brown* at ¶ 45.

{¶ 79} Counsel had every reason to fear what Mallory's testimony would become on cross-examination, because it had already happened once. At the first trial, Mallory testified on direct that she helped draft the apology and had Arnette apologize to keep the peace. On cross-examination that account disintegrated. She conceded that she did not construct the long apology, that she told Arnette to come up with something that felt real, that her contributions were grammatical, that Arnette drafted the message, including its opening expressions of remorse, and that she did not supply its most intimate detail, Arnette's account of his own childhood abuse. She also agreed with the prosecutor's characterization that the episode resembled a mother marching a child next door to apologize for a broken window. A second jury hearing that cross-examination would have learned that the apology's substance was Arnette's own, delivered through a witness whose shifting answers invited the jury to discount everything else she said, including her opinion that Madison was lying. The stipulation, by contrast, contained her testimony. It

kept Mallory's damaging cross-examination out of the case while preserving, in modest form, the fact that she had not challenged the apology in her dealings with Madison. Counsel could reasonably conclude that a limited stipulation was safer than a witness the State had already dismantled once. Debatable strategy is not deficiency.

### 3. Arnette Has Not Established Prejudice

{¶ 80} Nor has Arnette shown a reasonable probability of a different outcome. His argument rests on a comparison of verdicts, the first jury hung, the second convicted, and attributes the difference to Mallory's absence. The inference does not hold. The two trials were not controlled experiments differing in a single variable. The second trial included an additional charge of sexual battery arising from the July 4, 2020 incident, new testimony from Madison's boyfriend Greg Beach, and a differently developed record on both sides. A hung jury, moreover, is not an acquittal; it tells us only that at least one juror was unpersuaded, not that Mallory's testimony persuaded anyone.

{¶ 81} More fundamentally, Mallory's testimony would not have accomplished what Arnette claims for it. His premise is that she "testified in the first trial that she wrote the apology." She did not. As detailed above, her testimony was that Arnette drafted it. Her explanation, that she directed him to produce something that "felt real" to appease Madison, was itself a two-edged sword. It asked the jury to believe that Arnette composed a detailed confession, complete with an account (invented or genuine) of his own victimization, that was untrue. But a jury could as easily conclude that the most natural explanation for a heartfelt apology is that its author had something to apologize for. The consciousness-of-guilt inference was based on words Arnette indisputably sent, and Mallory's proffered context carried no reasonable probability of changing the result. To the extent Arnette's claim depends on what Mallory would have said at a second trial

beyond the existing record, it rests on matters outside the record and cannot be resolved on direct appeal.

{¶ 82} The sixth assignment of error is overruled.

### G. Cumulative Error

{¶ 83} Arnette suggests that the foregoing errors, taken together, deprived him of a fair trial. The cumulative-error doctrine permits reversal where the cumulative effect of multiple harmless errors deprives a defendant of a fair trial, but it has no application absent multiple findings of error. *Tucker*, 2012-Ohio-139, at ¶ 47-48 (12th Dist.). Having identified at most a single improper remark that caused no prejudice, we conclude that the doctrine is inapplicable.

### III. Conclusion

{¶ 84} We have overruled each of the assignments of error presented. The trial court's judgment is affirmed.

HENDRICKSON, P.J., and SIEBERT, J., concur.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Robert A. Hendrickson, Presiding Judge*

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*